10-2815-cr
United States v. Plugh

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: June 1, 2011          Decided: August 8, 2011)

Docket No. 10-2815-cr

_____

UNITED STATES OF AMERICA,

*Appellant,*

– v.–

GORDON J. PLUGH,

*Defendant-Appellee.*

_____

Before:  JACOBS, *Chief Judge*, LIVINGSTON, *Circuit Judge*, RAKOFF, *District Judge*.[*]

In light of the Supreme Court's decision in *Berghuis v. Thompkins*, -- U.S. --, 130 S. Ct. 2250 (2010), appellant the United States seeks reconsideration and reversal of an order of suppression entered by the District Court for the Western District of New York (Siragusa, *J.*) and previously affirmed by a panel of this Court.  Because we agree that *Berghuis* constitutes an intervening change in controlling law and because we further agree that *Berghuis* compels a different outcome on these facts, we vacate the district court's order of suppression.

VACATED AND REMANDED.

_____

[*] The Honorable Jed S. Rakoff, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

JOSEPH J. KARASZEWSKI, Assistant United States Attorney, *on behalf of* William J. Hochul, Jr., U.S. Attorney, Western District of New York, Buffalo, New York, *for Appellant*.

JEFFREY WICKS (Candice C. Baker Leit *on the brief*), Jeffrey Wicks, PLLC, Rochester, New York, *for Defendant-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

The instant appeal arises from the suppression of certain custodial statements made by defendant-appellee Gordon Plugh shortly after his arrest. The district court (Siragusa, *J.*) suppressed these statements after concluding that Plugh had successfully invoked his *Miranda* rights by declining to sign a waiver-of-rights form, *United States v. Plugh*, 522 F. Supp. 2d 481, 495-96 (W.D.N.Y. 2007), and a panel of this Court affirmed, *United States v. Plugh*, 576 F.3d 135, 137 (2d Cir. 2009) (hereinafter, "*Plugh I*"). Specifically, the *Plugh I* majority concluded that the defendant's "unequivocal[] refus[al] to sign the waiver [of rights] form" was itself sufficient to invoke those rights, *id.*, thus rejecting application of the standard set forth in *Davis v. United States*, 512 U.S. 452 (1994), whereby a defendant must "unambiguously" invoke his rights in order to cut off questioning, *Plugh I*, 576 F.3d at 142-43. As the *Plugh I* majority reasoned, "*Davis* does not instruct courts on how to analyze an *initial* invocation of one's Fifth Amendment rights following the *Miranda* warnings" but is instead limited to cases where a defendant attempts to "*subsequently* invoke[] previously waived Fifth Amendment rights." *Id.* at 143.

Shortly thereafter, while this case was pending before the district court, the Supreme Court announced its opinion in *Berghuis v. Thompkins*, --U.S.--, 130 S. Ct. 2250 (2010). There, the Court clarified that the *Davis* "unambiguous[]" statement standard *does* control a court's analysis of an

2

initial invocation of both the right to remain silent and the right to counsel, *id.* at 2259-60, and it further held, on the facts of that case, that the defendant's conduct, which included a refusal to sign an advice-of-rights form, did not amount to an "unambiguous" invocation of those rights sufficient to cut off further questioning by law enforcement officials, *id.* at 2256, 2260.

In light of *Berghuis*, the United States now asks us to revisit our decision affirming the order of suppression in *Plugh I*. Because we agree with the government that *Berghuis* constitutes "an intervening change in controlling law," *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983) (internal quotation marks omitted), and because we further agree that *Berghuis* compels a different outcome on these facts, we reconsider the district court's order of suppression in this case and now vacate that order.

## I. BACKGROUND

### A. The Custodial Statements

Because the underlying facts are amply set forth in *Plugh I*, we rehearse them here only as necessary to facilitate this discussion:

Defendant Plugh initially came to the attention of FBI agents in July 2005 during the course of an investigation into child pornography possession and online trafficking. At that time, agents questioned Plugh and, with his consent, obtained from him a personal computer to be searched. That search uncovered evidence of child pornography. On September 28, 2005, Plugh was arrested at his father's home in Wayland, New York. *Plugh I*, 576 F.3d at 137. Upon placing Plugh in handcuffs, the agents advised Plugh of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and then asked him to sign a waiver-of-rights form. That form, prominently labeled "YOUR RIGHTS," contained the following:

3

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

[Signature Line]

*Plugh*, 522 F. Supp. 2d at 486-87. Plugh, who "c[an] read and write," *id.* at 488, told the agents that he understood his rights, adding that he had previously worked in law enforcement as a state corrections officer, but he declined to sign the waiver on the grounds that "I am not sure if I should be talking to you" and "I don't know if I need a lawyer," *Plugh I*, 576 F.3d at 138 (quoting *Plugh*, 522 F. Supp. 2d at 487). Accordingly, the agent wrote "refused to sign" on the waiver form and placed Plugh in a car for transport to the FBI field office in Rochester. *Id.*

During the one-hour-and-fifteen minute drive to the FBI office in Rochester, Plugh repeatedly asked the agents "for advice on what to do." *Id.* While the agents made clear they would not discuss the case further with him at that time, they stated that should he wish to cooperate and answer questions, they would relay any such cooperation to the U.S. Attorney's Office handling the prosecution. No further relevant discussion took place for the remainder of the drive. *Id.*

4

Once at the FBI office in Rochester, the agents placed Plugh in a back interview room and informed him that he was about to be turned over to the U.S. Marshals for booking. They added, however, that "[i]f he wanted to make any statements this was the point" at which he should do so. *Id.* (alteration in original). Plugh then affirmatively indicated that he wished to make statements, and the agents re-advised him of his *Miranda* rights. At no point did Plugh indicate that he wished to consult with an attorney. *Id.* As the district court concluded in findings of fact which are not disputed before this Court, Plugh "was calm and cooperative. No threats or promises were made to the defendant to get him to talk to the police." *Plugh*, 522 F. Supp. 2d at 488. Plugh then signed a waiver-of-rights form and proceeded to make the series of inculpatory statements at issue on appeal. *Id.*

## B. *Plugh I*

Plugh was indicted in January 2007 on nine counts of receipt and possession of child pornography, *see* 18 U.S.C. § 2252A(a)(2)(A), (a)(5)(B), and defense counsel moved to suppress, among other things, Plugh's post-arrest statements. The district court held an evidentiary hearing on the motion, and then granted it in relevant part. Framing the inquiry as whether Plugh's conduct "[could] reasonably be construed to be an expression of a desire for the assistance of an attorney" or to remain silent, *Plugh*, 522 F. Supp. 2d at 491-92, the district court concluded that Plugh's "unequivocal[ ]" refusal to sign the waiver-of-rights form was sufficiently clear to meet that standard, *id.* at 495. Accordingly, it determined that the agents should have ceased all questioning in the face of that refusal to sign the form and suppressed the ensuing statements. *Id.* at 496.

The government appealed, and a divided panel of this Court affirmed. Relying heavily on the prior opinion of this Court in *United States v. Quiroz*, 13 F.3d 505 (2d Cir. 1993), which it read

5

to stand for the proposition that "when a custodial officer specifically asks a suspect if he will waive his rights by signing a form and does so in such a way that the accused would interpret a refusal to sign as a negative answer, the suspect has taken sufficient action to trigger the . . . prophylactic rule" announced in *Edwards v. Arizona*, 451 U.S. 477 (1981), the *Plugh I* majority concluded that Plugh had taken "sufficient action" on these facts to trigger that rule. *Plugh I*, 576 F.3d at 141-42. While acknowledging that "Plugh's statements, 'I am not sure if I should be talking to you' and 'I don't know if I need a lawyer' appear ambiguous," the majority found that "Plugh's ultimate action—his refusal to sign [the advice-of-rights form]—constituted an unequivocally negative answer to the question posed . . . namely, whether he was willing to waive his rights." *Id.* at 142 (quoting *Plugh*, 522 F. Supp. 2d at 487)).

In so concluding, the *Plugh I* majority expressly rejected application of the standard articulated in *Davis*, 512 U.S. at 542, whereby a defendant must "unambiguously" invoke his rights in order to cut off questioning. The panel majority reasoned, in reliance on its view of the law at the time *Plugh I* was decided, that *Davis* applies only in "circumstances in which a defendant makes a claim that he *subsequently* invoked previously waived Fifth Amendment rights." *Plugh I*, 576 F.3d at 143.

Chief Judge Jacobs dissented, arguing principally that the *Davis* standard should apply on these facts and that Plugh's conduct, considered in totem, "besp[oke] indecision and ambiguity." *Id.* at 146 (Jacobs, C.J., dissenting). With respect to the refusal to sign the waiver-of-rights form in particular, Chief Judge Jacobs argued that, in context, it was "wholly consistent with the expression of uncertainty" and was thus insufficient to unambiguously invoke the defendant's Fifth Amendment rights. *Id.* at 145.

6

## C. *Berghuis*

After *Plugh I* was decided but before the case proceeded to trial below, the Supreme Court announced its opinion in *Berghuis*. There, as here, the defendant had been offered the chance to sign an advice-of-rights form but had declined to do so.[2] *Berghuis*, 130 S. Ct. at 2256. There, as here, the defendant nonetheless subsequently made voluntary inculpatory statements to the police. On direct appeal, the defendant, Van Chester Thompkins, argued that his ensuing statements should have been suppressed because his conduct, namely his silence during several hours of attempted questioning, constituted an implicit invocation of those rights and thus should have cut off all further questioning. *Id.* at 2256-68. The state courts rejected that argument, and Thompkins filed a writ of habeas corpus in federal court reiterating those claims. *See* 28 U.S.C. § 2254. The Sixth Circuit granted the writ, reasoning that the invocation of Thompkins' rights could be "inferred" from his conduct on the whole. *Thompkins v. Berghuis*, 547 F.3d 572, 582 (6th Cir. 2008).

The Supreme Court reversed. As a preliminary matter, the Court clarified that the *Davis* "unambigous[]" invocation standard applies to both the right to counsel and the right to remain silent, and it applies where, as here, a court evaluates an initial rather than subsequent invocation. As the Court explained, a "requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] the difficulties of proof . . . and provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Berghuis*, 130 S. Ct. at 2260 (quoting *Davis*, 512 U.S. at 458-49) (alternations in original). Alternatively, "[i]f an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to

---

[2] The form at issue in *Berghuis*, unlike the form in this case, did not include a specific "waiver-of-rights" provision but otherwise set forth, in nearly identical language, the defendant's *Miranda* rights. *Berghuis v. Thompkins*, -- U.S. --, 130 S. Ct. 2250, 2256 (2010).

end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Id.* at 2259-60 (internal quotation marks, citation omitted).

Applying that standard, the Court then found, on those facts, that Thompkins had *not* "unambiguously" invoked his rights, rejecting as insufficient his mere silence in the face of several hours of attempted questioning. *See id.* Specifically, it noted that "Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." *Id.* at 2260 (internal quotation mars omitted). In assessing the asserted invocation, the Court made no mention of the advice-of-rights form or of Thompkins' refusal to sign it.

Having determined that Thompkins never invoked his *Miranda* rights, the Court proceeded to consider whether he had waived those rights and concluded that he had. Noting that "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford," the Court found that Thompkins had engaged in a "course of conduct indicating waiver," including voluntarily answering questions about the crime after being fully apprised of his rights. *Id.* at 2262-63 (internal quotation marks omitted). Accordingly, it concluded the statements were properly admitted at trial.

### D. The Decision Below

In light of *Berghuis*, the government asked the district court to reconsider its prior order suppressing the statements in this case. The district court denied the motion to reconsider. Noting that a panel of this Court had already affirmed the order of suppression, the district court declined to exercise its discretion to reconsider it. Moreover, it noted its belief that the facts here were

8

"distinct" from those in *Berghuis* because, in that court's view, Plugh's refusal to sign the waiver-of-rights form constituted an "unequivocal assertion of the right to counsel." This appeal ensued.

## II. DISCUSSION

### A. Law of the Case Doctrine

As a general matter, this Court will adhere "to its own decision at an earlier stage of the litigation." *Doe*, 709 F.2d at 789 (quoting *United States v. Cirami*, 563 F.2d 26, 33 n.6 (2d Cir. 1977)); *see also United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000) (same). However, this "law of the case" doctrine is subject to limited exceptions made for "compelling" reasons. *Doe*, 709 F.2d at 789. As we have explained, "[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id.* Similarly, where, as here, reconsideration of our prior decision requires revisiting and reversing existing Circuit law, we do so only under limited circumstances, among them, where "there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007) (internal quotation marks omitted). "The intervening decision need not discuss the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010).

The government argues that *Berghuis* constitutes an "intervening change of controlling law" sufficient to cause us to revisit our decision in *Plugh I*. We agree. As set forth more fully below, *Berghuis* departed from the law applied by the *Plugh I* majority in several, critical ways. Most important, as noted above, the *Berghuis* Court made clear that for a defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement. Because the *Plugh I* majority expressly rejected application of this "unambiguous" invocation

9

standard based on its view of the state of the law at the time of its decision, this change in controlling law alone warrants revisiting *Plugh I* and reconsidering the order of suppression entered below in light of the now clearly governing standard.

Plugh urges us to reject *Berghuis* as a statement of new law, arguing that it was a "fact-driven" case. While arguably true, the contention is unpersuasive in this context: as the *Plugh I* majority correctly noted, *all* "[c]ases in this area of law are fact intensive." *Plugh I*, 576 F.3d at 140. *Berghuis* clarified and altered the invocation standard prevailing in this Circuit at the time it was decided. And because it did so in a manner that departed significantly from the approach in *Plugh I*, we revisit the order of suppression and now consider it in light of *Berghuis*.

**B. Application of the *Berghuis* Standard**

As *Berghuis* instructs, the relevant inquiry is whether the defendant "unambiguously" invoked his *Miranda* rights. *Berghuis*, 130 S. Ct. at 2260. Here, we conclude he did not.[3] As a preliminary matter, it is undisputed that Plugh did not expressly state that he wanted to remain silent or that he wanted to consult with an attorney. *See Plugh,* 522 F. Supp. 2d at 488 ("The defendant never specifically requested an attorney, nor did he ever specifically indicate that he did not want to speak with law enforcement."); *cf. Berghuis*, 130 S. Ct. at 2260 ("Had [the defendant] made either of those simple, unambiguous statements, he would have invoked his [rights]. Here he did neither, so he did not invoke his right[s]." (internal quotation marks omitted)). Indeed, Plugh's only statements—"'I am not sure if I should be talking to you'" and "'I don't know if I need a lawyer'"—were appropriately deemed "ambiguous" by the *Plugh I* majority. *Plugh I*, 576 F.3d at 142. Those facts

---

[3] Because we revisit the district court's order of suppression, in doing so, we review its factual findings for clear error and in the light most favorable to the government. We review questions of law *de novo*. *See Plugh I*, 576 F.3d at 140 n.5.

10

alone give us strong reason to doubt that Plugh successfully invoked his rights in a manner sufficient to cut off all further questioning. *Cf. Davis*, 512 U.S. at 462 ("Unless the suspect *actually requests an attorney*, questioning may continue." (emphasis added)); *see also Berghuis*, 130 S. Ct. at 2276 (Sotomayor, J., dissenting) (characterizing *Berghuis* as announcing a "clear-statement rule").

Plugh instead argues that he invoked his *Miranda* rights through his "unequivocal" refusal to sign a waiver of rights form. We disagree. While we do not question the *Plugh I* majority's conclusion that Plugh gave an "unequivocally negative answer" with respect to the waiver form, *Plugh I*, 576 F.3d at 142, as this case amply demonstrates, a refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to *invoke* them. Indeed, the Supreme Court has made clear that "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (per curiam). Accordingly, invocation and waiver are governed by different standards, *see, e.g., Berghuis*, 130 S. Ct. at 2259-60, and carry critically different consequences, *compare Davis*, 512 U.S. at 458 ("If the suspect . . . waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him."), *with Edwards*, 451 U.S. at 484 ("[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation . . . . [he cannot be] subject to further interrogation by the authorities until counsel has been made available to him . . . ."); *see also Smith*, 469 U.S. at 98 ("The importance of keeping the two inquiries distinct is manifest.").

Consistent with *Miranda*, all criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel. But once those warnings are properly administered—as they, without question,

11

were in this case—a defendant is left to make his own choice as to how best to proceed. *See Oregon v. Elstad*, 470 U.S. 298, 308 (1985) ("Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities."). Without question, the most legally remarkable and distinct choices a defendant can make are to (1) unambiguously invoke those rights and thereby cut off further questioning or (2) knowingly and voluntarily waive those rights and cooperate fully. But between those two analytic end posts is a significant middle ground—one all too familiar to those with law enforcement experience—occupied by those suspects who are simply unsure of how they wish to proceed. With respect to these defendants, *Miranda* and its progeny impose no further burdens on law enforcement officers because once a defendant has been fully apprised of his rights, "the law has no preference as between invocation and waiver." *Plugh I*, 576 F.3d at 149 (Jacobs, C.J., dissenting); *see also Davis*, 512 U.S. at 462 ("[W]e are unwilling to create a third layer of prophylaxis to prevent police questioning when a suspect *might* want a lawyer. ").

Plugh's conduct, on the whole, makes clear that he found himself in that middle ground. While his refusal to sign the form presented to him upon arrest may have unequivocally established that he did not wish to waive his rights *at that time*, his concurrent statements made equally clear he was also not seeking to *invoke* his rights and thus cut off all further questioning at that point. Those statements, which as noted, the *Plugh I* majority deemed "ambiguous," bespoke indecision—i.e., "'I am not sure if I should be talking to you'"—and contemplation—i.e., "'I don't know if I need a lawyer.'" *Cf. Davis*, 512 U.S. at 455, 462 (finding statement "[m]aybe I should talk to a lawyer" too ambiguous to successfully invoke the right to counsel.). Plugh then continued to express uncertainty about how he wished to proceed by repeatedly asking the agents, during the drive to the FBI field office, for advice on what to do.

Critically, at no point did Plugh unambiguously inform the custodial officers that he wished to invoke his right to remain silent or his right to speak with an attorney, nor was his course of conduct such that the officers should reasonably have been put on notice that, consistent with *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), and *Edwards*, no further questioning could occur. We note, in this respect, that the Court has long made clear that the purpose of *Miranda* in the first place was to create "clearcut" rules that could be readily understood and administered by officers, *Miranda*, 384 U.S. at 469. In particular, because "it is police officers who must actually decide whether or not they can question a suspect," the law should avoid forcing them to make "difficult judgment calls about whether the suspect in fact wants [to invoke his rights], even though he has not [expressly] said so, with the threat of suppression if they guess wrong," *Davis*, 512 U.S. at 461; *see also Berghuis*, 130 S. Ct. at 2260 ("A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoids difficulties of proof and . . . provides guidance to officers on how to proceed in the face of ambiguity.") (internal quotation marks, alterations omitted) (ellipsis in original). Consistent with those principles, and because Plugh's conduct and statements were, on the whole, unclear, conflicted, and ambiguous, we cannot conclude that he invoked his rights in a manner sufficient to cut off all further questioning.

In concluding otherwise, the *Plugh I* majority relied heavily on our opinion in *Quiroz* which, as noted, it read to stand for the proposition that "when a custodial officer specifically asks a suspect if he will waive his rights by signing a form and does so in such a way that the accused would interpret a refusal to sign as a negative answer, the suspect has taken sufficient action to trigger the . . . prophylactic rule" announced in *Edwards*. *Plugh I*, 576 F.3d at 141. To the extent *Quiroz* can be read as articulating such a rule, that rule does not survive *Berghuis*. While we need not and do

13

not decide whether a refusal to sign a waiver-of-rights form could, itself, *ever* amount to "sufficient action to trigger the . . . prophylactic rule" announced in *Edwards*, it suffices to say, as the facts of this case amply demonstrate, that such a refusal will not *always* constitute "sufficient action" particularly where, as here, it is accompanied by statements indicating ambivalence or uncertainty.

Nor can we accept the proposition that because Plugh's conduct with respect to his rights was "not clear," the "custodial officers" should have instead "ask[ed] clarifying questions to determine if [the] suspect [was] exercising his rights." *Id.* at 140-41 (citing *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996)). As the Court has held before and emphasized again in *Berghuis*, absent an unambiguous invocation, custodial officers have no obligation to stop questioning *or* to ask only questions intended at clarifying an ambiguous statement. *See Berghuis*, 130 S. Ct. at 2259-60 ("If an accused makes a statement . . . that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, *or ask questions to clarify whether the accused wants to invoke his or her* Miranda *rights*." (internal quotation marks, citations omitted) (emphasis added)); *see also Davis*, 512 U.S. at 461-62 ("[W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal [invocation] . . . , the officers have no obligation to stop questioning him.").

In sum, we conclude on these facts that Plugh did not unambiguously invoke his right to remain silent or to speak with an attorney. As such, the custodial officers were under no obligation to cease all further questioning, nor are Plugh's subsequent statements made without the presence of an attorney automatically inadmissible.

### C. Waiver

Concluding that Plugh did not invoke his rights, however, does not end our inquiry. "Even absent the accused's invocation of [his rights], the accused's statement during a custodial

14

interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis*, 130 S. Ct. at 2260 (internal quotation marks omitted, second alteration in original). Because neither the district court nor the panel majority in *Plugh I* addressed this issue, we do so in the first instance.

The waiver inquiry, itself, has two "distinct" components. First, we must satisfy ourselves that the relinquishment of rights was "knowing," which is to say that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, it must have been "voluntary," which is to say "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam) (internal quotation marks omitted).

While the government bears the burden of demonstrating a knowing and voluntary waiver, such a waiver need not be express. *Berghuis*, 130 S. Ct. at 2261-62. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 2262; *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("[W]aiver can be . . . inferred from the actions and words of the person interrogated."). This is because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 130 S. Ct. at 2262; *see also United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) (same).

15

We are satisfied, on this record, that Plugh knowingly and voluntarily waived his rights to remain silent and consult with counsel both expressly and through a "course of conduct indicating waiver." *Butler*, 441 U.S. at 373. First, as noted above, Plugh did ultimately sign an express "waiver-of-rights" form before making the inculpatory statements in question. That fact, alone, is enough to strongly support the finding that Plugh, "who could read and write," *Plugh*, 522 F. Supp. 2d at 488, and expressed his familiarity with his rights, knowingly and freely waived those rights before speaking. *See Spencer*, 995 F.2d at 11-12 (finding knowing and voluntary waiver where defendant testified that he "was presented with an FBI waiver form describing his *Miranda* rights, . . . he read the form, and . . . he understood all his rights").

Moreover, and consistent with *Berghuis*, we are satisfied that "with a full understanding of his . . . rights" Plugh acted "in a manner inconsistent with their exercise" when he chose to begin speaking with custodial agents at the FBI field office, and, as such made a "deliberate choice to relinquish the protections those rights afford." *Berghuis*, 130 S. Ct. at 2262. We reiterate, in this respect, that there is no dispute that Plugh was advised of his *Miranda* rights before he began speaking with the custodial agents or that he understood those rights. Indeed, the record makes clear, first, that Plugh informed the officers that he was familiar with his rights because of his experience as a state corrections officer; second, that the agents advised Plugh of those rights for a second time immediately before he began speaking; and third, as noted, that Plugh at that point did sign the waiver-of-rights form. Given these circumstances, his choice to proceed to make inculpatory statements regarding the alleged offense conduct can be seen as nothing less than conclusive evidence of a knowing and voluntary relinquishment of his rights.

Finally, we have no reason to doubt the voluntariness of that waiver or the ensuing, inculpatory statements. Certainly Plugh does not claim that the officers threatened him or that he

16

was intimidated in any way. To the contrary, we note approvingly the factual finding of the district court, uncontested on appeal, that "there is no evidence the defendant was subject to any type of coercion by [the agents]. He was never threatened physically or psychologically abused in any manner, or made any type of promises such that his will was overborne." *Plugh*, 522 F. Supp. 2d at 494. Indeed, it was Plugh—not the agents—who initiated the further conversation that ultimately led to his inculpatory statements by soliciting "advice on what to do" during the drive from his father's home to the FBI office.

Accordingly, we conclude that the government carried its burden of establishing that Plugh knowingly and voluntarily waived his rights by (1) signing a waiver-of-rights form, and (2) otherwise engaging, after being informed of those rights on two separate occasions, in a course of conduct inconsistent with their exercise. His ensuing, inculpatory statements are thus admissible.

* * *

In sum, therefore, we hold, consistent with *Berghuis*, that for a defendant to invoke either the right to remain silent or the right to counsel, he must do so unambiguously, and that a refusal to sign a waiver of those rights, however unequivocal, is not itself necessarily sufficient to establish an unambiguous invocation thereof. We further hold, on these facts, that Plugh's course of conduct was sufficient to expressly and impliedly waive those rights, rendering his subsequent inculpatory statements admissible.

### III. CONCLUSION

The order of suppression entered by the district court is VACATED, and this case is remanded for further proceedings not inconsistent with this opinion.

17